# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO. 3:18-353** |
| **JAMES EUGENE ROUGHT** | : | **(JUDGE MANNION)** |
| **Defendant** | : | |

## MEMORANDUM

Presently before the Court is the defendant James Eugene Rought's ("Rought") motion to suppress (Doc. 36). Rought seeks to suppress statements that he made to law enforcement, arguing that they were obtained illegally after he invoked his right to counsel. Based on the following, Rought's motion to suppress (Doc. 36) will be **DENIED**.

### I. BACKGROUND

On October 16, 2018, Rought was indicted with one count of distribution and possession with the intent to distribute a controlled substance that resulted in the serious bodily injury of Cara Giberson and the death of Dana Carichner. (Doc. 1). Rought pleaded not guilty to the indictment. (Doc. 11).

On October 19, 2018, FBI Special Agent Whitehead and Task Force Officer Yelland interviewed Rought while he was in custody. At the beginning

of the interrogation, Agent Whitehead read Rought his *Miranda* rights from a consent form,[1] and stated, "If you decide to answer questions now without a lawyer present, you have a right to stop answering questions at any time. Do you understand what I read to you?" (Doc. 44, Ex. A, at 2:39). Rought replied affirmatively and, after allowing Rought to review the consent form, Agent Whitehead asked, "Are you willing to talk to us now?" (*Id.*, at 2:58). Rought responded, "I mean, to a point, yeah," and signed the consent form. (*Id.*, at 3:00).

After approximately 24 minutes of questioning, Rought discussed his relapse after a period of sobriety, stating that everyone around him was "getting high" including Mr. Carichner. (*Id.*, at 23:57). Agent Whitehead asked Rought to talk about what happened to Mr. Carichner. Rought responded, "I mean, I don't really want to talk about that aspect of it without my lawyer because, like, that's a serious situation. I mean, they're trying to roof me . . . ." (*Id.*, at 24:13). Agent Whitehead replied, "We get that . . . those are the ground rules. . . . That's your right, and we respect that," (*Id.*, at 24:26), and immediately moved onto questioning Rought about a drug dealer named

---

[1] *Miranda* rights refers to the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), which inform a suspect of the right to be silent and the right to counsel in a custodial interrogation.

"L.B." and "who's above you." (*Id.*, at 24:38). Agent Whitehead stated, "You mentioned before [that] Stan overdosed, right?"[2] and Rought discussed various acquaintances of his that had recently died from drug overdoses. (*Id.*, 25:04). Agent Whitehead then stated,

> I'm not judging you. It's not my job to judge you. We're just trying to make sense of it and we're just trying to put the pieces together, and we're trying to follow . . . the logical chain as going up . . . the ladder, if you will. Right? That's why I want to talk about this L.B. I want to talk about who[m]ever else there is, too. That's why I asked you earlier on, too, "Is L.B. somebody that you might want to protect?" because, if you do, then . . . that tells me that we probably shouldn't talk about him.

(*Id.*, at 27:13).

Rought indicated he did not mind discussing L.B. and stated, "[Drug dealers] are killing my friends just as much as, right now, you're trying to say that I killed my friend." (*Id.*, at 27:44). Agent Whitehead replied, "Well, we're not saying you killed him, um, James, but what we're saying is that, um, that you had, you had a role." (*Id.*, at 27:50). Rought subsequently went on to discuss the circumstances around Dana Carichner's death.

---

[2] Earlier in the interview, Rought explained that Stan Derby, a person Rought had known to trade firearms with L.B. in exchange for drugs, had died of a drug overdose. (*Id.*, at 19:20).

- 3 -

On May 13, 2019, Rought filed the present motion to suppress (Doc. 36) and a brief in support (Doc. 41). On June 25, 2019, a superseding indictment was filed against Rought, charging him with an additional count of possession with the intent to distribute a controlled substance and one count of conspiracy to possess with the intent to distribute a controlled substance that resulted in the serious bodily injury of Ms. Giberson and the death of Mr. Carichner. (Doc. 48). On June 28, 2019, Rought pleaded not guilty to the superseding indictment. (Doc. 56). That same day the government filed a brief in opposition to Rought's motion to suppress. (Doc. 55). On July 26, 2019, Rought filed a reply brief. (Doc. 62). The motion is now ripe for disposition.

**II.     LEGAL STANDARD**

"At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966).

Prior to interrogation, police must first inform a suspect of his right to remain silent, his right to have counsel present during interrogation, and the possibility that his statements may be used to secure a conviction. *Miranda v. Arizona*, 384 U.S. 436, 468-70 (1966). Police "must cease the interrogation

if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989).

Once a suspect has expressed his desire to remain silent until he has conferred with counsel, further interrogation may only continue after counsel has been made available or "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). Two factors must be present for interrogation to continue: "First, the suspect must initiate the conversation with the authorities, not vice versa. Second, after the suspect initiates the conversation, the waiver of the right to counsel and the right to silence must be knowing and voluntary." *Velasquez*, 885 F.2d at 1084.

An initiation occurs "when a suspect initiates a conversation 'evinc[ing] a willingness and a desire for a generalized discussion about the investigation.'" *Id.* At 1085 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)). As to the second factor, a court must look at the totality of the circumstances to determine whether the waiver was made voluntarily, knowingly, and intelligently. *Velasquez,* 885 F.2d at 1086.

Pertinent here, a suspect may limit his request for counsel to certain areas of questioning. *Connecticut v. Barrett*, 479 U.S. 523 (1987) (holding

that a suspect invoked his *Miranda* right to counsel with respect to written but not oral statements). A limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation. *Id.* at 529.

### III. DISCUSSION

Rought asserts that the law enforcement officers were required to immediately cease the interrogation when Rought stated he did not want to discuss what happened to Mr. Carichner without his lawyer. Rought construes his statement not as a limited invocation of his right to counsel, but as a broad invocation to the right to counsel as to all questioning. Rought argues that because the interrogation continued, all statements he made after expressing his desire for an attorney must be suppressed.

Rought further argues that, even if his invocation was limited, his statements must be suppressed because they were the result of questions that law enforcement knew or should have known were likely to elicit an incriminating response regarding Mr. Carichner. More specifically, Rought contends that Agent Whitehead's questions about L.B. and Stan Derby were likely to elicit incriminating information from Rought because they were related to the circumstances of Mr. Carichner's death. Finally, Rought

argues that his statements after the invocation cannot be considered a post-invocation initiation because there was not a cessation of interrogation prior to the re-initiation of discussion about Mr. Carichner.

In response, the Government asserts Rought made a limited invocation of his right to counsel which law enforcement scrupulously honored by diverting the questioning back to L.B., consistent with the questioning in the first half of the interrogation. The Government asserts that Rought thereafter re-initiated the subject of Mr. Carichner with his statement "[Drug dealers] are killing my friends just as much as, right now, you're trying to say that I killed my friend." (Doc. 44, Ex. A, at 27:44).

Despite this re-initiation, the Government asserts that law enforcement did not pursue a line of questioning about Mr. Carichner, and Agent Whitehead's statement that Rought had a role in Mr. Carichner's death was responsive and not inquisitorial in nature. Regarding Mr. Derby, the Government observes that he was a completely different individual than Mr. Carichner, and one whom Rought identified as a person who traded firearms with L.B. in exchange for drugs. Thus, the Government asserts that the mention of Mr. Derby by Agent Whitehead was not reasonably likely to elicit an incriminating response from Rought and, therefore, the re-initiation was done voluntarily by Rought. Accordingly, the Government argues that

Rought's motion should be denied because Rought freely re-initiated discussion of Mr. Carichner and, despite this re-initiation by Rought, law enforcement did not pursue further questioning about him.

The court has carefully reviewed the entire videotaped interview conducted in the case. Contrary to Rought's assertions, his invocation of the right to counsel was limited and not broad in nature, given his statement, "I don't really want to talk about *that aspect* of it without my lawyer." (Doc. 44, Ex. A, at 24:13) (emphasis added). By his own words, Rought left all other subjects open to questioning. Upon review of the recording of the interview, the Court agrees with the Government that law enforcement properly ceased interrogation about Mr. Carichner after Rought's limited invocation in accordance with the *Edwards* rule, and that law enforcement did not prompt Rought's return to the subject of Mr. Carichner. The questioning about L.B. and Mr. Derby, a person to whom L.B. sold drugs, were subjects distinct from that of the circumstances surrounding Mr. Carichner and not ones that law enforcement should have reasonably anticipated would prompt Rought to renew discussions about Mr. Carichner. Additionally, the topic of Mr. Derby's death was not synonymous with Mr. Carichner's death merely because both men were alleged to have died of drug overdoses. Indeed, throughout the interview, Rought mentioned numerous friends of

his that had recently died of drug overdoses without discussing Mr. Carichner.

Finally, Rought's waiver of his limited invocation of the right to counsel was, under the totality of the circumstances, knowing and voluntary. Rought appeared to be an intelligent adult able to read, speak, and write in English and therefore was able to read and understand the waiver form he signed. There was no suggestion of intimidation or coercion by law enforcement to return to the subject of Mr. Carichner after Rought expressed a desire not to speak about the subject without counsel present. Moreover, throughout the interview, Rought repeatedly mentioned his prior arrests and convictions and thus was well-familiar with his *Miranda* rights, but nevertheless chose to waive them. Accordingly, viewing the totality of the circumstances, both factors under *Edwards* were present and, because Rought's waiver of his *Miranda* rights was knowing and voluntary, his statements during the October 19, 2018 custodial interview are admissible.[3]

---

[3] Although Rough cites *United States v. Iyamu*, 356 F. Supp. 3d 810 (D. Minn. 2018), as persuasive, that case is distinguishable. There, the court found that the defendant, a suspect in a wire fraud conspiracy, made a broad invocation of his right to counsel during an in-home interrogation because he expressed several times throughout the interview that he wished to have counsel present before answering questions about "the fraud." *Id.* at 815. Here, by contrast, Rought expressed his desire for counsel only with respect to one topic and one topic only: Mr. Carichner. Despite this, Rought, unlike

## IV. CONCLUSION

Based on the foregoing, the Court finds that Rought's statements to the agents during his interview were made after being given his *Miranda* rights and after having knowingly and intentionally waived them. Therefore, Rought's motion for suppression (Doc. 36) shall be **DENIED**. An appropriate order shall issue.

s/ *Malachy E. Mannion*

**MALACHY E. MANNION**
**United States District Judge**

**DATE: October 2, 2019**
18-353-01

---

the defendant in *Iyamu*, chose to reinitiate discussion of Mr. Carichner, unprompted by law enforcement. Accordingly, *Iyamu* is distinguishable from the instant case.